**Pennypacker v. Mace**

*Barbara H. Behringer,* for plaintiff.
*Lisa D. Gentile,* for defendant.

LASH, *J.,* January 26, 2010—The matters before this court are two custody complaints, the first involving the parties' elder child and the second being filed after the birth of the parties' younger child. The matters were

consolidated and trial was held on January 21, 2010. This court enters the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Deliverance H. Pennypacker (Mother), is an adult individual who currently resides at 628 North Reading Avenue, New Berlinville, Berks County, Pennsylvania 19525.

(2) Defendant, Jeremiah A. Mace (Father), is an adult individual residing at 637 Swamp Pike Road, Gilbertsville, Berks County, Pennsylvania 19525.

(3) Both parties reside in the Boyertown School District.

(4) The parties are the natural parents of two minor children, Isaiah M. Mace, born October 18, 2005, and Serenity Pennypacker, born June 29, 2009 (minor children).

(5) The parties are currently husband and wife. The parties are separated, but no divorce action has been filed.

(6) The parties separated on July 31, 2008, when Father obtained a temporary protection from abuse order against Mother, evicting Mother from the parties' residence, a trailer, located in Barto, Pennsylvania.

(7) When Mother was evicted, she took up residence at her current location, which is the home of her mother, Stacey Lynn Hart (maternal grandmother), her husband, Warren Hart, and the couple's two adopted children,

Skyler Hart, born July 26, 2000, and Tristin Daniel Hart, born August 14, 2002.

(8) Approximately two days after the temporary order was entered, Father relocated from the marital residence to his current residence, which is the home of his parents, Stan and Koreen Mace. Also residing in that home is Father's brother, Joshua.

(9) On July 30, 2008, this court entered a final order on the protection from abuse petition, by agreement without admission, with the order to expire in one year. The order contained temporary custody provisions setting forth that Father would have primary custody of the minor child, Isaiah, and that Mother would have visits to take place every Friday and Saturday from 9 a.m. until 8 p.m. and every Sunday from 12 noon to 5 p.m., to take place at the paternal grandparents' home.

(10) On or about August 26, 2008, Mother filed a complaint for custody to docket no. 08-9784, I.D. #2. This resulted in an order being entered December 8, 2008 on motion of the custody support master setting forth, among other things, that Father would retain primary physical custody of Isaiah and Mother would have partial physical custody of Isaiah every Friday from 12 noon to Sunday at 12 noon, so long as Mother was residing in the maternal grandmother's home.

(11) Subsequent to the birth of Serenity, on February 17, 2009, Father filed a custody complaint, seeking primary custody of Serenity. He also filed a petition for emergency relief alleging, among other things, that

Mother was refusing to allow Father to see Serenity and that Mother was neglecting and abusing Serenity.

These actions were filed to docket no. 08-9784, I.D. #3.

(12) The parties reached an agreement to resolve the emergency petition, which was entered as an order of court on March 4, 2009, setting forth that the parties would share custody of Serenity on a 50/50 basis, so long as Mother was residing in the residence of the maternal grandmother, as follows: In week one, Father would have custody from Wednesday at 12 p.m. until Friday at 12 p.m., then Mother would commence custody from Friday at 12 p.m. until Sunday at 12 p.m., then Father would resume custody from Sunday at 12 p.m. until Tuesday at 12 p.m., and then Mother would resume custody from Tuesday at 12 p.m. until Wednesday at 12 p.m. In week two, Mother would then have custody from Wednesday at 12 p.m. until Thursday at 12 p.m., then Father would have custody from Thursday at 12 p.m. until Friday at 12 p.m., then Mother would have custody from Friday at 12 p.m. until Sunday at 12 p.m., then Father would have custody from Sunday at 12 p.m. until Tuesday at 12 p.m., and then Mother would have custody from Tuesday at 12 p.m. until Wednesday at 12 p.m., with the aforesaid two weeks schedule to continue to alternate.

(13) On March 30, 2009, Mother filed a petition to modify the custody order entered December 8, 2008 regarding Isaiah. By order of March 31, 2009, the two actions were then consolidated.

(14) Father is currently employed at Armstrong Landscaping. During the months from March to December, he works from Monday through Friday from 9 a.m. to 3 p.m. From December to March, he works part-time approximately 10 hours per week.

(15) Mother is currently employed at CVS Pharmacy in Boyertown. She has a flexible schedule, providing that on some days she would work eight hours and other days four hours, contingent upon the child custody schedule.

(16) The court ordered an independent psychological evaluation to be performed by Ivan L. Torres Ed.D. Dr. Torres conducted interviews with the parties, the maternal grandmother and her husband, the paternal grandparents, Steven Shaner, an individual who resided with the parties at one time and who dated Mother, and the maternal grandmother's adopted children, Tristin and Skyler. Dr. Torres also reviewed the court dockets and conducted an in-home inspection of both households. He then provided an evaluation report, dated August 26, 2009. Subsequently, Dr. Torres conducted an additional in-home evaluation of both residences and provided an updated report, dated the date of trial, January 21, 2010.

## II. DISCUSSION

In making disposition, this court considered the testimony of the parties, the maternal and paternal grandmothers, a friend of the parties, Joie Horner, a friend of the paternal grandmother's, Barbara Ann Schultz, a former girlfriend of Father's, Allisha Walters, the report and

testimony of Dr. Torres, and the exhibits submitted by the parties.

Both parties seek primary custody of the minor children.

Father presented first. He set forth that during the time the parties resided together, he was the primary caretaker of Isaiah.

He fed the minor child, changed the minor child's diapers, and tended to all his needs. When Serenity was born, the parties had already separated and according to Father, Mother had denied him access. He then filed an emergency petition within a month, resulting in him obtaining shared custody of Serenity.

Father states that the paternal grandparents provide him a strong support system. They are available when he is working or involved in one of his activities, such as volunteer firefighting. However, he, as well as the paternal grandmother, make it clear that the responsibilities for the care of the minor children are Father's, not the grandparents.

Father admits that he has in the past been involved in improper activities. He admits being involved with a friend shooting BB gun pellets into windows of unattended parked vehicles, for which he was arrested. He also admits involvement in marijuana and cocaine use. He is currently on probation. However, he states that his bad behavior is in the past. He cites his decision to volunteer to fight fires. He also has attended parenting classes held at the Boyertown Public Library. In essence,

he states that while the minor children are with him, they benefit from a stable, healthy, happy home.

Father and his witnesses categorize Mother's ability to care for her minor children in Mother's household as abysmal. There are allegations of abuse, including discipline by biting, which Mother allegedly learned from the maternal grandmother. There are marks consistent with pinching. Father alleged that Mother has thrown Isaiah across the floor, and Mother strikes the minor children.

Father alleges that Mother is inattentive and provides little, if any, care when the minor children are with her. He states that she refused to change diapers. Often, Isaiah would remain in wet diapers until he came home from work. She would not feed the minor children when they were hungry because she was too lazy to get up from the couch, although she was willing to do so to feed herself. She locks the minor children in their room and does not respond when they cry, even for a period of up to two hours, nor checks on them to see if there is any significant problem. She is constantly bickering with the maternal grandmother. On one occasion, according to Ms. Horner, Isaiah fell down the steps because the gate at the top of the steps was not properly secured. Ms. Horner warned Mother of this but she, nevertheless, did nothing to safeguard Isaiah's safety. Isaiah was bitten by a dog on one occasion. Father also alleges that the household is unsanitary with a stench from cat urine and feces. One of Father's witnesses also maintained that the maternal grandmother restricted Isaiah from running to visit with

the paternal grandmother during a chance encounter at a garage sale.

Father also questions Mother's involvement with other men. An individual named Steven Shaner, who was a mutual friend, has significant emotional and abuse issues of his own, and cannot be permitted to be around the minor children. Father believes that Mother maintains a relationship with him. Mother has also searched on the internet for companions and has advertised herself in a provocative manner. Father believes that Mother's household is unsafe and that Mother should not be permitted visits unless they are supervised.

Mother was involved in an altercation at a Wal-Mart store with another woman, in the presence of Isaiah. She was arrested for this incident and is not permitted on the Wal-Mart premises.

Mother testified that she was the primary caretaker of Isaiah, not Father, until the protection from abuse order was entered. She states that she was responsible for Isaiah's caretaking when the parties resided together. She states that she fed, bathed, and diapered the minor children, taking them to their medical visits. Further, Father could not be trusted. She alleges that Father was addicted to Ritalin, that when his Ritalin prescription ran out, he resorted to cocaine, and that he was usually either high or sleeping, being completely unavailable to care for Isaiah.

Mother maintains that her current household is appropriate, but that Father's household must be evaluated, particularly whether Father even resides there. She al-

leges that Father resides at the Barto Hotel with his girlfriend and that the paternal grandparents care for the minor children when they are supposed to be in Father's care. One of Father's girlfriends testified that the two of them did live together in the Barto Hotel for several weeks, including during times when Father was scheduled to care for the minor children.

Mother also has serious concerns about Father's brother, Joshua, who resides in the paternal grandparents' home. She states that she was advised by Father that Joshua had sexually abused Father when he was young. Joshua has also been diagnosed with mental health problems and was committed for a period of time. Mother is concerned about having her minor children exposed to Joshua.

Mother categorically denies Father's allegations. She denies that she abuses the minor children in any way. She denies that she has ever bitten the minor children, that her mother has ever bitten her, or that this occurs in her household. In fact, she states she doesn't even spank the minor children. She denies any relationship with Steven Shaner. She denies that she has any improper involvement with men. She denies that her household is unsanitary. She denies that she leaves the minor children unattended or refuses to check on them, instead leaving them locked in the room. She does state that Isaiah sometimes wants to sleep with her and that she would have to put Isaiah back in his bedroom and lock him in so that he would learn the responsibility of sleeping in his own bed.

Mother and the maternal grandmother deny that they have a poor relationship. The maternal grandmother states that Mother can live with her as long as necessary. The maternal grandmother states that any smell of cat urine did not come from her house, but from the neighbor's house who had 60 cats at one time. The neighbors relocated due to foreclosure, and the house next door has now been cleaned up and the smell no longer exists. The maternal grandmother does admit, however, that she has six cats and several dogs.

Mother also complains that Father does not comply with the court-ordered custody schedule, often showing up early, as much as an hour early, with the minor children. He also comes early to pick the minor children up on occasion. Mother testified that Father refuses to permit her phone contact with the minor children when they are in his care.

Dr. Torres provided some very strong opinions. He found that both parents were immature, presenting high-risk factors for the minor children. Regarding Father, he has a history of substance abuse and impulsive behaviors resulting in a criminal history. His embattled relationship with Mother has impacted on the well-being of the minor children. Mother is immature to the point that she is not yet emancipated. Her lifestyle is unstable. Her partner choices are inappropriate, based on deficits in moral development. Dr. Torres alleges that Mother appears unable to determine the consequences of her sexual and other impulsive behaviors, as well as the negative outcomes of her maladaptive behaviors.

Dr. Torres believes that the paternal grandparents are appropriate caregivers and are the one source of stability for the minor children. On the other hand, the maternal grandmother and her husband do not appear invested in caring for the minor children.

Father's household is appropriate. On the other hand, Mother's household is cluttered and unsanitary. Dr. Torres reported a significant cat stench when he was there for the first visit, which had been alleviated during the second visit. However, there are still examples of lack of cleanliness, including failure to clean the bathtub. The quarters are cramped, with Mother, Serenity, and Skyler sleeping in one room and Tristan and Isaiah in another room.

Dr. Torres recommends that the parties should share legal custody with Father to have primary custody, so long as he resides in the home of the paternal grandparents. Mother can have visits, but the visits should be held in the paternal grandparents' home or some other safe environment. Isaiah should receive therapeutic intervention focused on strengthening his expressive and emotional domains. Finally, Steven Shaner should have no contact with either minor child due to the risk factors present in his life.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of "all factors which legitimately

have an effect upon [a] child's physical, intellectual, moral and spiritual well-being." *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

This case is difficult, primarily because both parents are immature. Neither appears capable of living independently of his or her parents. Both parents have questionable backgrounds. They were previously combative and now refuse to communicate. Both are willing to jump into new relationships without apparent regard for the minor children.

With that being said, Father has apparently made some strides. It appears that he does have concerns for the minor children and has worked to provide proper maintenance. His enrollment in parenting classes is commendable and appropriate. His work with the volunteer fire company shows his willingness to provide aid to the community.

Importantly, the paternal grandparents provide an appropriate home. While it is important that Father eventually become separated from them and become independently able to sustain himself and his minor children, for the short term, the arrangement is beneficial for the minor children.

We note Mother's concern that Father spends time outside the household when he has a relationship with another woman. This has taken place in the past and could very well continue to be happening. Father must recognize that his first responsibility must be to his minor children and that it is not the paternal grandparents' duty to be the primary caretakers of the minor children. Nev-

ertheless, Father needs to have an opportunity to have a social life, and it is not improper for the paternal grandparents to periodically baby-sit. Further, in this matter, there does not appear to be any other viable alternative.

While both parents need to work toward improvement, at least Father is making some effort. Mother does not appear to want to exert any energy. Father's categorization that Mother would rather sit on a chair than attend to the minor children, even when they needed to be fed or diapered, is believable. The parties' friend, Joie Horner, testified of an occasion where Mother stuffed a banana peel inside Ms. Horner's sofa rather than get up and throw it away. Her marked obesity at her young age is evidence of her sedentary lifestyle. This may be one reason why the maternal grandmother does not want to get involved in the care of the minor children, for if she did, Mother would be "off the hook" and the maternal grandmother would find herself with all of the responsibilities.

We also find Mother's testimony to lack any credibility. Mother was unfortunately very capable of making broad and absolute denials of nearly all of the allegations against her, even when facing strong evidence to the contrary. She appears to be defensive, with low self-esteem, and is unable to accept responsibility. The allegations regarding her willingness to bite the minor children as punishment is particularly troubling. Further, her living arrangements are crammed, cluttered, and unclean. Finally, Mother appears quite capable of introducing new boyfriends into the lives of the minor children, which

508

boyfriends may be of questionable character and potentially harmful to the minor children.

For all these reasons, we award Father primary custody of both minor children. Mother shall be permitted partial custody on alternate weekends. These visits will be permitted to be unsupervised. We are hopeful that providing specified conditions in the order will be sufficient protection for the minor children. Moreover, visits supervised by the paternal grandparents, as suggested by Dr. Torres, would create a different set of problems because of the poor relationship between Mother and the paternal grandparents. Also, Children Services has investigated Mother's household and did not find a need for services from the agency. If there are any further problems, this court can quickly intervene and impose whatever requirements are necessary.

We enter the following order:

## ORDER

And now, January 26, 2010, after trial held, custody of the parties' minor children, Isaiah M. Mace, born October 18, 2005, and Serenity Pennypacker, born June 29, 2009 (minor children), shall be as follows:

(1) The parties shall share legal custody of the minor children.

(2) Defendant, Jeremiah A. Mace (Father), shall have primary custody of the minor children.

(3) Plaintiff, Deliverance H. Pennypacker (Mother), shall have partial physical custody of the minor children

on alternate weekends from Friday at 6 p.m. to Sunday at 6 p.m., and at such other times as the parties may agree.

(4) The parties shall alternate the following named holidays each year from 9 a.m. to 8 p.m., with Mother having the next holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day, and Thanksgiving.

(5) Mother shall have Mother's Day each year and Father shall have Father's Day each year from 9 a.m. to 6 p.m.

(6) Regarding Christmas, the parties shall alternate schedules such that in odd-numbered years, Mother shall have custody from December 24 at 2 p.m. to December 25 at 2 p.m., and Father shall have December 25 at 2 p.m. through December 26 at 2 p.m., with the parties to switch in even-numbered years.

(7) Each party shall be entitled to one week of uninterrupted time with the minor children for purposes of vacation. The vacationing party shall provide the non-vacationing party with at least 60 days written notice of the dates and times for said vacation.

(8) The holiday and vacation schedules shall take precedence over the regular custody schedule.

(9) Neither party shall commit any act against either minor child which rises to the level of abuse. Specifically, no parent, nor other caretaker, shall be permitted to bite any minor child at any time.

(10) Steven Shaner shall not be permitted to have any contact with the minor children at any time.

(11) Mother shall not allow any friends, including boyfriends of hers, to have unsupervised contact with the minor children.

(12) The minor children shall be properly fed and their cleanliness maintained at all times.

(13) Each parent shall take parenting courses. Each party shall be responsible for his or her own costs.

(14) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's

medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's

best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children

to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.